FILED

2022 Apr-06  AM 10:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **HAMP CRUM, III,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:20-cv-00449-MHH** |
| | } | |
| **FORWARD AIR SOLUTIONS INC.,** | } | |
| | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

In this employment action, Hamp Crum seeks overtime wages that he contends his former employer, Forward Air Solutions, Inc., owes him under § 207(a)(1) of the Fair Labor Standards Act.  29 U.S.C. § 207(a)(1).  FAS contends that, as a matter of law, under the FLSA's Motor Carrier Act exemption in 29 U.S.C. § 213(b)(1), § 207 does not apply to Mr. Crum.  FAS has asked the Court to enter judgment in its favor on Mr. Crum's FLSA claim.  (Doc. 29).  This opinion resolves FAS's motion for summary judgment.

The opinion begins with a discussion of the standard that a district court uses to evaluate motions for summary judgment.  Then, consistent with the summary judgment standard, the Court identifies the evidence that the parties have submitted, describing the evidence in the light most favorable to Mr. Crum.  Finally, the Court

evaluates Mr. Crum's evidence against the legal standards governing FLSA exemptions.

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may give an opportunity to properly support or address the fact." FED. R. CIV. P. 56(e)(1).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party. *Sconiers v. Lockhart*, 946 F.3d 1256, 1260

(11th Cir. 2020).  Accordingly, the Court views the evidence in the light most favorable to Mr. Crum and draws all reasonable inferences from the evidence in his favor.

## II.

Forward Air Solutions "transports by motor vehicles" – namely box trucks and tractor-trailer trucks – "goods and property for third parties for compensation." (Doc. 30-4, p. 1, ¶ 2).  FAS is registered with the Department of Transportation. (Doc. 30-4, p. 1, ¶ 7).  Mr. Crum worked at FAS's terminal in Montgomery, Alabama.  (Doc. 30-4, p. 1, ¶ 3).  Vendors deliver goods to FAS's Montgomery terminal.  FAS employees unload the goods from the vendors' trucks and load the goods on trucks for delivery to retailers.  (Doc. 30-4, p. 1, ¶ 6).

While Mr. Crum worked for FAS, FAS assigned its employees at the Montgomery terminal to one of three shifts.  During the first shift, FAS employees unloaded inbound trucks.  (Doc. 30-1, p. 17, tpp. 67-68).  The employees placed boxes of product on a conveyor belt and scanned the boxes.  (Doc. 30-1, p. 17, tpp. 67-68).  FAS nicknamed the first shift the "Burlington shift" because most of the product unloaded during the first shift was bound for Burlington retail stores.  (Doc. 30-1, p. 17, tp. 68).  FAS employees had to package Burlington's products on a pallet for shipping to retail locations.  (Doc. 30-1, pp. 17-18, 20, tpp. 67-69, 80; Doc. 35, p. 19, ¶ 15).

Mr. Crum began working for FAS in October of 2018 on the first shift in the role of dock lead. (Doc. 30-1, pp. 8, 15, tpp. 32, 58). As a dock lead, FAS paid Mr. Crum an hourly rate and considered him eligible to receive overtime wages. (Doc. 30-2, p. 6, tp. 21). As dock lead, Mr. Crum unloaded boxes from trucks, scanned boxes, loaded Burlington pallets and shrink-wrapped them, and loaded the pallets on a forklift. (Doc. 30-1, p. 18, tp. 71). While he worked on first shift, Mr. Crum typically worked five days per week. (Doc. 30-1, p. 20, tp. 78).

During the second shift, FAS employees unloaded inbound trucks and loaded outbound vehicles, typically eighteen-wheel tractor-trailers which sometimes traveled interstate. (Doc. 30-1, p. 19, tpp. 73-76; Doc. 35, p. 19, ¶ 16). FAS employees would load eighteen-wheeler trailers with boxes manually "from the floor to the ceiling, from the front to the back, from the nose to the tail." (Doc. 30-1, p. 22, tpp. 85-88; *see also* Doc. 30-1, p. 25, tpp. 98-99). FAS employees would put heavy boxes on the floor of the trailer to build a base. (Doc. 30-1, p. 26, tp. 104).

In January or February of 2019, FAS moved Mr. Crum to the second shift where he worked as dock lead. (Doc. 30-1, pp. 15, 19, tpp. 58-59, 73-76; Doc. 35, p. 19, ¶ 16). As a dock lead, Mr. Crum had to arrive an hour before the other employees on his shift arrived. (Doc. 30-1, p. 29, tp. 113). During that hour, he gathered scanners and got the terminal organized for the second-shift employees. (Doc. 30-1, p. 29, tp. 113). Once the other second-shift employees arrived, Mr.

4

Crum typically would begin unloading a truck and scanning the boxes of product removed from an incoming truck. (Doc. 30-1, p. 22, tp. 88). Other FAS employees took the boxes that Mr. Crum unloaded from an inbound truck and loaded the boxes on one of three outbound tractor-trailer trucks. (Doc. 30-1, pp. 22-23, tpp. 88-90). If his unloading outpaced the employees who were loading outbound tractor-trailers, Mr. Crum would stop unloading and would help the loaders. (Doc. 30-1, pp. 22-23, tpp. 88-90). As dock lead on second shift, Mr. Crum worked 60 to 65 hours per week. (Doc. 30-1, pp. 27, 28, 30, tpp. 107, 111, 117-18; *see also* Doc. 30-1, p. 99).

During his tenure on the second shift, FAS changed Mr. Crum's title to dock supervisor. (Doc. 30-1, p. 21, tp. 83). Mr. Crum testified that when his job title changed, his job duties remained the same; he "worked as a cargo handler." (Doc. 30-1, p. 34, tp. 134; Doc. 30-1, p. 36, tp. 141).[1] When he became dock supervisor, he worked longer hours, but he was supposed to work 40 hours per week or less. (Doc. 30-1, pp. 27, 28, 30, tpp. 107, 111, 117-18; *see also* Doc. 30-1, p. 99). As a dock supervisor, Mr. Crum transitioned from an hourly wage to a salary, and FAS no longer regarded him as qualified to receive overtime wages. (Doc. 30-2, p. 8,

---

[1] FAS's written job description for dock supervisors assigns a variety of tasks to the position including planning for safe loading of freight and dockworker training. (Doc. 30-1, p. 116). The written job description also indicates that the position requires "[f]requent lifting, pulling, pushing, and carrying of freight, up to 50 lbs." (Doc. 30-1, p. 116). According to Kyle Sherwood, FAS's 30(b)(6) representative, a dock supervisor typically spends 20 to 40 percent of a shift acting as a cargo handler. (Doc. 30-2, p. 10, tp. 35). At the summary judgment stage, the Court credits Mr. Crum's version of the facts because he is the non-movant.

tpp. 26-27; Doc. 35, p. 19, ¶ 8).  Mr. Crum testified that he "took on more hours with less pay." (Doc. 30-1, p. 34, tp. 136).  Mr. Crum contends that he often worked more than 40 hours each week, and as "a direct result of not being eligible for overtime compensation, [he] lost between $300-$400 dollars per week." (Doc. 35, p. 19, ¶ 9; *see also* Doc. 30-1, p. 34, tp. 136).

At the end of 2019 or the beginning of 2020, FAS made Mr. Crum dock supervisor for the third shift.  (Doc. 30-1, p. 30, tp. 119).[2]  During the third shift, FAS employees loaded outbound vehicles, typically box trucks for local delivery to Burlington stores.  (Doc. 30-1, pp. 19, 21, 26, tpp. 75, 82, 103).  Occasionally, the third shift would load an eighteen-wheeler for Burlington, and that truck would travel across state lines.  (Doc. 30-1, p. 31, tp. 124).  FAS employees on the third shift worked 12 to 13-hour shifts.  (Doc. 30-1, p. 24, tp. 94).  Each box truck would make deliveries to several customers, so boxes on box trucks were organized by retail location according to information on a load sheet.  (Doc. 30-1, pp. 25-26, 32, 33, tpp. 100-01, 128, 131).

Each day, the second and third shifts ended when all outbound trucks – typically three eighteen-wheelers on the second shift or multiple box trucks on the

---

[2] Mr. Crum remained on third shift until FAS laid him off on April 3, 2020, because of a reduction in force caused by the COVID-19 pandemic. (Doc. 30-1, p. 47, tpp. 186-87).

third shift – were fully loaded per the daily manifest.  (Doc. 30-1, p. 29, tpp. 114-15).

At its Montgomery terminal, FAS's direction to its employees for loading trucks was this:  "put as much as possible" on a truck "and ship it out."  (Doc. 30-1, p. 21, tpp. 82-83; *see also* Doc. 30-1, pp. 21, 25, 27, tpp. 83-84, 97, 107; Doc. 30-1, p. 107).  FAS did not train Mr. Crum on the proper way to load a truck.  (Doc. 30-1, p. 25, tp. 98).

### III.

As noted, FAS contends that the FLSA's overtime provision does not apply to Mr. Crum.  Under the FLSA, employers must pay employees an overtime rate for hours worked in excess of 40 in a week.  29 U.S.C. § 207(a)(1).  The FLSA exempts certain categories of employees from the statute's overtime wage provision.  Courts must give those exemptions a "fair reading."  *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).[3]  An employer "has the burden of establishing by a preponderance of the evidence that it is entitled to the benefit of an exemption . . . ."  *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1566 n.5 (11th Cir.

---

[3] In *Navarro*, the Supreme Court rejected the principle that "exemptions to the FLSA should be construed narrowly" because that principle "relies on the flawed premise that the FLSA pursues its remedial purpose at all costs."  *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (internal quotation marks and citations omitted).

1991); *see also Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009).

FAS argues that the FLSA's Motor Carrier Act exemption forecloses Mr. Crum's claim for overtime wages. That exemption, found at 29 U.S.C. § 213(b)(1), provides that § 207 "shall not apply with respect to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [the Motor Carrier Act]." 29 U.S.C. § 213(b)(1); *Morris v. McComb*, 332 U.S. 422, 424 (1947) (explaining that the overtime requirements of § 207 of the FLSA do not apply to employees who are exempt under the Motor Carrier Act). "Congress created this exemption to eliminate any conflict between the jurisdiction exercised by the Department of Labor [] over the FLSA and the mutually exclusive jurisdiction exercised by the DOT over the MCA." *Walters*, 575 F.3d at 1226. The exemption applies if the DOT has the power to regulate the work of "a particular group of employees." *Walters*, 575 F.3d at 1226.

The MCA exemption applies if an employee works for a freight carrier subject to the Motor Carrier Act and "the employee's business-related activities [] 'directly affect[ ] the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act'." *Walters*, 575 F.3d at 1227 (quoting

8

*Baez v. Wells Fargo Armored Service Corp.*, 938 F.2d 180, 182 (11th Cir. 1991) and

citing 29 C.F.R. § 782.2(a)); *see also Levinson v. Spector Motor Service*, 330 U.S.

649, 673-74 (1947).  The character of the employee's activities, not the "time spent

in certain activities," determines whether an employee is subject to the jurisdiction

of the DOT.  *Levinson*, 330 U.S. at 652 n.3.  Mr. Crum acknowledges that FAS is a

freight carrier subject to the MCA, but he contends that he does not engage in

activities that affect the safe operation of the trucks he loads.

For the MCA exemption to override the FLSA's overtime provision for an

employee, an employer must establish that the specific employee for whom the

employer claims the exemption is engaged in activities that directly affect the safe

operation of motor vehicles in interstate transportation.  *Pyramid Motor Freight*

*Corp. v. Ispass*, 330 U.S. 695, 707-08 (1947).  FAS contends that Mr. Crum worked

for the company as a loader.  Per *Ispass*, this Court must "determine whether or not

the activities of" Mr. Crum:

> either as a whole or in substantial part, come within the [DOT]'s
> definition of the work of a 'Loader'. In determining whether the
> activities, or any substantial part of the activities, of an individual come
> within those of such a 'loader,' the District Court shall not be concluded
> by the name which may have been given to his position or to the work
> that he does, nor shall the District Court be required to find that any
> specific part of his time in any given week must have been spent in
> those activities. The District Court shall give particular attention to
> whether or not the activities of the respective [employees] included that
> kind of 'loading' which is held by the [DOT] to affect safety of
> operation. In contrast to the loading activities in the *Levinson* case, the
> mere handling of freight at a terminal, before or after loading, or even

the placing of certain articles of freight on a motor carrier truck may
form so trivial, casual or occasional a part of an employee's activities,
or his activities may relate only to such articles or to such limited
handling of them, that his activities will not come within the kind of
'loading' which is described by the [DOT] and which, in its opinion,
affects safety of operation. Except insofar as the [DOT] has found that
the activities of drivers, mechanics, loaders and helpers, as defined by
it, affect safety of operation, it has disclaimed its power to establish
qualifications or maximum hours of service under § 204 of the Motor
Carrier Act.

If none of the alleged 'loading' activities of the respective [employees],
during the periods at issue, come within the kind of activities which,
according to the [DOT], affect the safety of operation of motor vehicles
in interstate or foreign commerce within the meaning of the Motor
Carrier Act, then those [employees] of which that is true are entitled to
the benefits of [§] 7 of the Fair Labor Standards Act. On the other hand,
if the whole or a substantial part of such alleged 'loading' activities of
the respective [employees], during the periods at issue, do come within
the kind of activities which, according to the [DOT], affect such safety
of operation, then those [employees] who are engaged in such activities
are excluded from the benefits of such [§] 7.

*Ispass*, 330 U.S. 695, 707-08 (1947) (internal citations omitted).

In its motion for summary judgment, FAS's analysis of Mr. Crum's activities

proceeds from a faulty premise; FAS relies on a DOL regulation to define the safety-

related job duties of a loader.  (Doc. 31, pp. 9-10) (citing 29 C.F.R. § 782.5).  Per

*Ispass*, the DOT has jurisdiction over this issue, not the DOL.  The Supreme Court

stated unequivocally in *Levinson*:

Before examining further the new issue presented by the facts of this
case, it is important to recognize that, by virtue of the unique provisions
of § 13(b) (1) of the Fair Labor Standards Act, we are not dealing with
an exception to that Act which is to be measured by regulations which
Congress has authorized to be made by the Administrator of the Wage

10

and Hour Division. United States Department of Labor. Instead, we are dealing here with the interpretation of the scope of the safety program of the Interstate Commerce Commission, under § 204 of the Motor Carrier Act, which in turn is to be interpreted in the light of the regulations made by the Interstate Commerce Commission pursuant to that Act.

330 U.S. at 676-77;[4] *see also Williams v. Central Transport Int'l, Inc.*, 830 F.3d 773, 778 (8th Cir. 2016) ("As the Supreme Court held in *Levinson*, 330 U.S. at 676-77, 67 S.Ct. 931, the [Department of Labor] has no authority to define what employees are subject to the Secretary of Transportation's jurisdiction and therefore fall within the [Motor Carrier Act] Exemption, a ruling acknowledged in the DOL's regulations. *See* 29 C.F.R. § 782.1(a). Accordingly, we give no weight or deference to the DOL's regulation purporting to define who is an exempt loader.").

Because FAS has the burden to establish that Mr. Crum falls within the MCA exemption, to establish as a matter of law that the exemption applies and precludes Mr. Crum's FLSA claim, FAS must begin with DOT regulations or other guidance from the DOT; FAS may not rely on DOL regulatory pronouncements. In *Levinson*, the Supreme Court identified the ICC regulation then in effect that governed the Supreme Court's analysis of loaders. *Levinson*, 330 U.S. at 652 n.2. That may be a starting point for FAS if it decides to renew its motion for summary judgment.

---

[4] The Interstate Commerce Commission was the DOT's predecessor.

Should FAS renew its motion, to carry its burden, FAS should address whether the predominantly intrastate operation of trucks loaded during the third shift is relevant to application of the MCA exemption. *See Walters*, 575 F.3d at 1226-27; 29 C.F.R. § 782.1(c). With respect to Mr. Crum's work on the third shift, FAS also should address the Small Vehicle Exception to the MCA exemption. *See Altare v. Vertical Reality MFG, Inc.*, 2021 WL 1723581, at *6-7 (S.D. Fla. Apr. 30, 2021). Finally, the Court notes that the DOL has stated the following in a fact sheet under the caption "Typical Problems":

> The Section 13(b)(1) overtime exemption does not apply to employees not engaged in "safety affecting activities", such as dispatchers, office personnel, those who unload vehicles, or those who load but are not responsible for the proper loading of the vehicle. Only drivers, drivers' helpers, loaders who are responsible for proper loading, and mechanics working directly on motor vehicles that are to be used in transportation of passengers or property in interstate commerce can be exempt from the overtime provisions of the FLSA under Section 13(b)(1).

U.S. DEPARTMENT OF LABOR WAGE AND HOUR DIVISION, https://www.dol.gov/agencies/whd/fact-sheets/19-flsa-motor-carrier (last visited Apr. 5, 2022). The Court places no weight on the DOL's analysis but recognizes that the DOL's observations may reflect DOT guidance.

## CONCLUSION

For the reasons discussed, the Court does not have enough information in the parties' current submissions to determine whether FAS may carry its burden with respect to the MCA exemption to the FLSA's overtime provision. Consequently,

the Court denies FAS's motion for summary judgment on Mr. Crum's FLSA claim without prejudice to FAS renewing the motion using the DOT regulations that governed Mr. Crum's activities at FAS.

**DONE** and **ORDERED** this April 6, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE