FILED

2023 Feb-06  PM 04:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **HAMP CRUM, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:20-cv-00449-MHH** |
| **FORWARD AIR SOLUTIONS, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | | |

### MEMORANDUM OPINION

Plaintiff Hamp Crum III seeks overtime wages from Forward Air Solutions under the Fair Labor Standards Act.  In its second motion for summary judgment, FAS asserts that because Mr. Crum regularly loaded and unloaded trucks in his work as a dock supervisor, the Motor Carrier Act, rather than the FLSA, governs FAS's relationship with Mr. Crum and exempts FAS from the FLSA's overtime provision. (Doc. 41).  Mr. Crum contends that FAS wrongly classified him as a loader exempt from FLSA wage and hour requirements and argues that FAS has not adequately addressed evidence critical to this Court's assessment of the application of the MCA loader exemption to him.  (Docs. 47, 54).  This opinion resolves FAS's second motion for summary judgment.

By way of background, FAS first moved for summary judgment on May 12,

2021.  (Doc. 29).  The Court denied that motion without prejudice because it "[did] not have enough information in the parties' [] submissions to determine whether FAS [could] carry its burden with respect to the MCA exemption."  (Doc. 39, p. 12). In particular, the Court noted that FAS incorrectly relied on Department of Labor regulations in its motion and advised that if FAS renewed its motion for summary judgment, the company should focus on regulations or guidance from the Department of Transportation, not the Department of Labor.  The Court also directed FAS to consider the "Small Vehicle Exception to the MCA exemption" and to discuss "whether the predominantly intrastate operation of trucks loaded during the third shift is relevant to application of the MCA exemption."  (Doc. 39, p. 12).  FAS has complied with these instructions in its renewed motion for summary judgment.

The Court begins this opinion by reciting the applicable summary judgment standard.  Then, applying that standard, the Court presents the evidence in the light most favorable to Mr. Crum.  Finally, the Court examines the evidence under the law concerning the MCA exemption to the FLSA.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  To demonstrate a genuine dispute as to a material fact that precludes summary judgment, the party opposing a motion for

summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of certain evidence, the court cannot make credibility determinations; that is the work of jurors. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also Buending v. Town of Redington Beach*, 10 F.4th 1125, 1130 (11th Cir. 2021).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in the non-moving party's favor. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Therefore, in this opinion, the Court views the summary judgment evidence in the light most favorable to Mr.

Crum.

## II.

Using box trucks and tractor-trailer trucks, Forward Air Solutions transports "goods and property for third parties for compensation." (Doc. 30-4, p. 1, ¶ 2). FAS is registered with the Department of Transportation. (Doc. 30-4, p. 1, ¶ 7). Mr. Crum worked at FAS's terminal in Montgomery, Alabama. (Doc. 30-4, p. 1, ¶ 3). Vendors deliver goods to FAS's Montgomery terminal. FAS employees unload the goods from the vendors' trucks and load the goods on trucks for delivery to retailers. (Doc. 30-4, p. 1, ¶ 6).

While Mr. Crum worked for FAS, FAS assigned employees at its Montgomery terminal to one of three shifts. During the first shift, FAS employees unloaded inbound trucks. (Doc. 30-1, p. 17, tpp. 67-68). The employees placed boxes of product on a conveyor belt and scanned the boxes. (Doc. 30-1, p. 17, tpp. 67-68). FAS nicknamed the first shift the "Burlington shift" because most of the product unloaded during the first shift was bound for Burlington retail stores. (Doc. 30-1, p. 17, tp. 68). FAS employees packaged Burlington's products on pallets for shipping to retail locations. (Doc. 30-1, pp. 17-18, 20, tpp. 67-69, 80; Doc. 35, p. 19, ¶ 15).

During the second shift, FAS employees unloaded inbound trucks and loaded outbound vehicles, typically eighteen-wheel tractor-trailers which sometimes

traveled interstate.  (Doc. 30-1, p. 19, tpp. 73-76; Doc. 35, p. 19, ¶ 16).  FAS employees would load eighteen-wheeler trailers with boxes manually "from the floor to the ceiling, from the front to the back, from the nose to the tail."  (Doc. 30-1, p. 22, tpp. 85-88; *see also* Doc. 30-1, p. 25, tpp. 98-99).  FAS employees would put heavy boxes on the floor of the trailer to build a base.  (Doc. 30-1, p. 26, tp. 104).  FAS instructed employees to "put as much as possible" on a truck "and ship it out."  (Doc. 30-1, p. 21, tpp. 82-83; *see also* Doc. 30-1, pp. 21, 25, 27, tpp. 83-84, 97, 107; Doc. 30-1, p. 107).

The third shift was twelve hours long.  (Doc. 30-1, p. 24, tp. 94).  During the third shift, FAS employees loaded outbound vehicles, typically box trucks for local delivery to Burlington stores.   (Doc. 30-1, pp. 19, 21, 26, tpp. 75, 82, 103).  Occasionally, the third shift would load an eighteen-wheeler for Burlington, and that truck would travel across state lines.  (Doc. 30-1, p. 31, tp. 124).

Mr. Crum worked for FAS from October 2018 to April 2020.  (Doc. 30-1, p. 8, tp. 32).  Initially, Mr. Crum worked on the first shift as a dock lead.  He unloaded boxes from trucks, scanned boxes, loaded Burlington pallets and shrink-wrapped them, and loaded the pallets on a forklift.  (Doc. 30-1, p. 18, tp. 71).  Mr. Crum arrived an hour before the other employees on his shift, using that time to gather scanners and organize the terminal.  (Doc. 30-1, p. 29, tp. 113).

In January or February of 2019, FAS moved Mr. Crum to the second shift

where he continued to work as a dock lead.  (Doc. 30-1, pp. 15, 19, tpp. 58-59, 73-76; Doc. 35, p. 19, ¶ 16).  In April 2019, FAS made Mr. Crum a second-shift dock supervisor and changed his compensation from hourly wages to a salary.  (Doc. 42-2, p. 8, tp. 26-27).  Mr. Crum testified that when his job title changed, his job duties remained the same; he "worked as a cargo handler."  (Doc. 30-1, p. 34, tp. 134; Doc. 30-1, p. 36, tp. 141).  Mr. Crum testified that he spent more than three hours every day loading trucks and that "[n]inety percent of my job was as a cargo handler."  (Doc. 30-1, pp. 23-24, tp. 92-93).  FAS did not train Mr. Crum on the proper way to load a truck.  (Doc. 30-1, p. 25, tp. 98).

When he became dock supervisor, Mr. Crum often worked more than 40 hours each week, and as "a direct result of not being eligible for overtime compensation, [he] lost between $300-$400 dollars per week."  (Doc. 35, p. 19, ¶ 9; *see also* Doc. 30-1, p. 34, tp. 136).  At the end of 2019 or the beginning of 2020, FAS made Mr. Crum dock supervisor for the third shift.  (Doc. 30-1, p. 30, tp. 119).  Mr. Crum remained on third shift until FAS laid him off on April 3, 2020, because of a reduction in force caused by the COVID-19 pandemic.  (Doc. 30-1, p. 47, tpp. 186-87).

## III.

Mr. Crum contends that his compensation as a dock supervisor violated the FLSA.  Under the FLSA, employers ordinarily must pay hourly employees an

6

overtime rate for hours worked in excess of 40 in a week. 29 U.S.C. § 207(a)(1). The FLSA exempts certain employees from the statute's overtime wage provision. Courts must give those exemptions a "fair reading." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).[1]  An employer "has the burden of establishing by a preponderance of the evidence that it is entitled to the benefit of an exemption . . . ." *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1566 n.5 (11th Cir. 1991); *see also Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009).  "Whether employees are exempt from the requirements of the [FLSA] is primarily a question of fact." *Hodgson v. Klages Coal & Ice Co.*, 435 F.2d 377, 382 (5th Cir. 1970); *see also Hodgson v. Colonnades, Inc.*, 472 F.2d 42, 47 (5th Cir. 1973).[2]

As noted, the exemption at issue here is the FLSA's Motor Carrier Act exemption. That exemption, found at 29 U.S.C. § 213(b), provides that § 207 "shall not apply with respect to – (1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [the Motor Carrier Act]." 29 U.S.C. § 213(b)(1);

---

[1] In *Encino Motorcars, LLC v. Navarro*, the Supreme Court rejected the principle that "exemptions to the FLSA should be construed narrowly" because that principle "relies on the flawed premise that the FLSA pursues its remedial purpose at all costs." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (internal quotation marks and citations omitted).

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the Court of Appeals for the Fifth Circuit decided prior to October 1, 1981.

*Morris v. McComb*, 332 U.S. 422, 424 (1947) (explaining that the overtime requirements of § 207 of the FLSA do not apply to employees who are exempt under the Motor Carrier Act). "Congress created this exemption to eliminate any conflict between the jurisdiction exercised by the Department of Labor [] over the FLSA and the mutually exclusive jurisdiction exercised by the DOT over the MCA." *Walters*, 575 F.3d at 1226.

The MCA exemption applies if an employee works for a freight carrier subject to the Motor Carrier Act, and "the employee's business-related activities [] 'directly affect[] the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.'" *Walters*, 575 F.3d at 1227 (quoting *Baez v. Wells Fargo Armored Service Corp.*, 938 F.2d 180, 182 (11th Cir. 1991), and citing 29 C.F.R. § 782.2(a)); *see also Levinson v. Spector Motor Service*, 330 U.S. 649, 673-74 (1947). Mr. Crum acknowledges that FAS is a freight carrier subject to the MCA and that while he worked for FAS as a dock supervisor, he loaded trucks, but he contends that when he loaded trucks, he did not position cargo so as to ensure the safe operation of the trucks, so the Motor Carrier Exemption does not preclude his recovery of overtime wages under the FLSA.

More than 80 years ago, the predecessor to the Department of Transportation, the Interstate Commerce Commission, found that certain "classes of activities,"

necessarily "affect the safety of operation of motor vehicles and that, therefore, employees engaging in such classes of activities are subject to the Commission's power to prescribe their qualifications and maximum hours of service." *Levinson*, 330 U.S. at 669-670. The ICC included among those "classes of activities" the activity of loading, "or immediately directing" the work of loading a truck. *Levinson*, 330 U.S. at 669-670. The ICC defined a "loader," as someone whose "sole dut[y] [is] to load and unload motor vehicles and transfer freight between motor vehicles and between the vehicles and the warehouse." *Levinson*, 330 U.S. at 652 n.2 (quoting Ex. Parte No. MC–2, 28 M.C.C. 125, 133–34). The ICC stated that "a motor vehicle must be properly loaded to be safely operated on the highways of the country" and that "[t]he great majority, if not all, of the carriers whose operations are of sufficient size or character to justify the employment of loaders handle freight of such weight that proper loading is necessary." *Levinson*, 330 U.S. at 652 n.2. The ICC explained:

> If more weight is placed on one side of the vehicle than on the other, there is a tendency to tip when rounding curves. If more weight is placed in the rear of the vehicle, the tendency is to raise the front wheels and make safe operation difficult. Further, it is necessary that the load be distributed properly over the axles of the motor vehicle.

*Levinson*, 330 U.S. at 652 n.2.

In *Levison*, the Supreme Court held that the ICC properly exercised its jurisdiction in finding that loaders affect the safe operation of motor vehicles, and

the Supreme Court stated that it saw "no reason to question [the ICC's] considered conclusion" in that regard. *Levinson*, 330 U.S. at 673; *see also Levinson*, 330 U.S. at 685. The Supreme Court held that where a substantial part of the activities of a terminal foreman "consisted of the doing or immediate direction of the very kind of activities of a loader that are described by the [ICC] as directly affecting safety of operation," the foreman came under the jurisdiction of the ICC – today the DOT – rather than the Department of Labor such that the foreman was "excluded, automatically, from the benefits of" the FLSA. *Levinson*, 330 U.S. at 681; *see also Levinson*, 330 U.S. at 685. That was so, the Supreme Court held, even though the ICC "ha[d] not exercised [its] power affirmatively by establishing qualifications and maximum hours of service with respect to loaders." *Levinson*, 330 U.S. at 673.

The Supreme Court explained that it used the term "partial-duty loader" rather than "part-time loader" to describe the terminal foreman whose work it examined "to avoid the implication that time spent in certain activities, rather than the character of those activities, is to be the conclusive factor in deciding whether or not the individual is subject to the jurisdiction of the Commission." *Levinson*, 330 U.S. at 652 n.3. The Supreme Court observed:

> even a full-duty loader may engage in some activities which do not affect safety of operation. Such 'non-safety' activities may make up another 'large part' of the loader's total activities. They may constitute an even larger part of his activities than his safety-affecting activities.

*Levinson*, 330 U.S. at 670. The "fundamental test is simply that the employee's activities affect safety of operation," even though "[t]he verb 'affect' is itself incapable of exact measurement." *Levinson*, 330 U.S. at 671. The Supreme Court noted that from the ICC's standpoint, "it is not a question of fundamental concern whether or not it is the larger or the smaller fraction of the employee's time or activities that is devoted to safety work. It is the character of the activities rather than the proportion of either the employee's time or of his activities" that determines whether the employee falls within the MCA exemption. *Levinson*, 330 U.S. at 674. This is so because, for example, though "the work of a full-duty driver may affect safety of operation during only that part of the time while he is driving, yet, as a practical matter, it is essential to establish reasonable requirements with respect to his qualifications and activities at all times in order that the safety of operation of his truck may be protected during those particular hours or days when, in the course of his duties as its driver, he does the particular acts that directly affect the safety of its operation." *Levinson*, 330 U.S. at 674.

The day that it issued its decision in *Levinson*, the Supreme Court issued a companion decision in *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695 (1947). There, the Supreme Court considered how a court should determine whether an employee whose duties include but are not limited to loading activities is exempt from the FLSA. The Supreme Court explained that a district court must review

evidence describing the employee's actual work and determine whether the
employee's activities:

> either as a whole or in substantial part, come within the [DOT]'s
> definition of the work of a 'Loader'. In determining whether the
> activities, or any substantial part of the activities, of an individual
> come within those of such a 'loader,' the District Court shall not be
> concluded by the name which may have been given to his position
> or to the work that he does, nor shall the District Court be required
> to find that any specific part of his time in any given week must have
> been spent in those activities. The District Court shall give particular
> attention to whether or not the activities of the respective
> [employees] included that kind of 'loading' which is held by the
> [DOT] to affect safety of operation. In contrast to the loading
> activities in the *Levinson* case, the mere handling of freight at a
> terminal, before or after loading, or even the placing of certain
> articles of freight on a motor carrier truck may form so trivial, casual
> or occasional a part of an employee's activities, or his activities may
> relate only to such articles or to such limited handling of them, that
> his activities will not come within the kind of 'loading' which is
> described by the [DOT] and which, in its opinion, affects safety of
> operation. Except insofar as the [DOT] has found that the activities
> of drivers, mechanics, loaders and helpers, as defined by it, affect
> safety of operation, it has disclaimed its power to establish
> qualifications or maximum hours of service under § 204 of the
> Motor Carrier Act.
>
> If none of the alleged 'loading' activities of the respective
> [employees], during the periods at issue, come within the kind of
> activities which, according to the [DOT], affect the safety of
> operation of motor vehicles in interstate or foreign commerce within
> the meaning of the Motor Carrier Act, then those [employees] of
> which that is true are entitled to the benefits of [§] 7 of the Fair Labor
> Standards Act. On the other hand, if the whole or a substantial part
> of such alleged 'loading' activities of the respective [employees],
> during the periods at issue, do come within the kind of activities
> which, according to the [DOT], affect such safety of operation, then
> those [employees] who are engaged in such activities are excluded
> from the benefits of such [§] 7.  If some, but less than a substantial

> part, of such activities of the respective respondents, during some or all of the periods at issue, come within the kind of activities which, according to the Commission, affect such safety of operation, then the right of those respondents who were engaged in such activities to receive the benefits of [§] 7 of the Fair Labor Standards Act does not come within the precise issue determined in the Levinson case and this Court reserves its decision as to the power of the Commission to establish qualifications and maximum hours of service with respect to them.

*Ispass*, 330 U.S. at 707-09 (internal citations omitted).  The Supreme Court remanded the *Ispass* case for the district court "to determine whether or not the activities of each" of the eight employees who Pyramid Motor categorized as delivery clerks or "push-boys" in fact "consisted, in whole or in substantial part, of the class or work which is defined by the [DOT] . . . as that of a 'loader' of freight for an interstate common carrier by motor vehicle, and as affecting the safety of operation of motor vehicles in interstate or foreign commerce."  *Ispass*, 330 U.S. at 698; *see also Ispass*, 330 U.S. at 707 (requiring district court to make findings as to the activities of each respondent).[3]

Here, the evidence, viewed in the light most favorable to Mr. Crum, places him within the DOT's jurisdiction.  FAS's corporate representative, Kyle Sherwood, testified that when Mr. Crum worked as a dock supervisor, Mr. Crum spent, on average, 20-40% of his time loading and unloading trucks.  (Doc. 42-2, pp. 10, 21,

---

[3] The evidence in *Ispass* consisted of the parties' stipulated facts.  *Ispass*, 330 U.S. at 699, 705. The relevant facts appear in footnote 5 of the opinion.  *Ispass*, 330 U.S. at 699 n.5.

tpp. 35, 80).[4]  Because the estimate includes time for unloading, jurors reasonably could infer that Mr. Crum spent less than 20-40% of his time loading trucks.  Mr. Crum explained that in 2019 when he worked as a dock supervisor on the second shift, he primarily was responsible for unloading incoming 18-wheelers and directing the boxes from the incoming truck to three outgoing trucks for other employees to load.  Some days, he would do nothing but unload incoming trucks.  On other days, if the loaders got "backed up," Mr. Crum would stop unloading and help load.  (Doc. 30-1, pp. 22-24, tpp. 88-91, 95).  Mr. Crum stated that he could not give an average number of hours that he spent loading trucks while he worked on the second shift because those hours varied with the number of trucks that his team processed, but he testified that it was not unusual for him to spend an average of more than three hours per day loading trucks.  (Doc. 30-1, p. 24, tpp. 93-94).  In December 2019, when Mr. Crum moved to the third shift, a 12-hour shift, he sometimes would spend an entire shift loading.  Because the third shift was dedicated to loading box trucks, when Mr. Crum was not performing supervisory duties, he was loading trucks.

Given the extent of his responsibilities for loading trucks or overseeing the loading of trucks, Mr. Crum's work falls within the jurisdiction of the DOT rather

---

[4] According to Mr. Sherwood, as a dock supervisor, Mr. Crum was responsible for scheduling, paperwork, safety training, and counseling and disciplining subordinate employees, and every employee on Mr. Crum's shift reported to him.  (Doc. 42-2, pp. 9-10, tpp. 31-36).

than the DOL.   To paraphrase *Levinson*, though Mr. Crum's work as a dock supervisor may have affected safety of operation during only that part of the time that he was loading a truck or overseeing others who were loading trucks, "it is essential to establish reasonable requirements with respect to his qualifications and activities at all times" to ensure the safe operation of the trucks he loaded "during those particular hours or days when, in the course of his duties . . . , he [did] the particular acts that directly affect[ed]" the safe operation of those trucks.   *Levinson*, 330 U.S. at 674.

Mr. Crum has not provided evidence that creates a genuine issue of material fact regarding any other aspect of the MCA exemption.   FAS provided evidence that the trucks Mr. Crum loaded and unloaded traveled in interstate commerce, either directly or as part of a "continuous stream of interstate travel" with a "practical continuity of movement between the intrastate segment and the overall interstate flow."   *See Walters*, 575 F.3d at 1229; (Doc. 42-4, p. 2, ¶¶ 4-6).   Mr. Crum has not pointed to contrary evidence or disputed that the trucks loaded and unloaded at FAS's Montgomery terminal were engaged in interstate commerce.   Likewise, FAS's evidence indicates that all trucks loaded or unloaded at the Montgomery terminal weighed at least 10,000 pounds.   (Doc. 42-4, p. 2, ¶ 8).   Mr. Crum points to no contrary evidence that would tend to suggest the trucks weighed less.   Thus, there is not a genuine issue of material fact regarding the interstate commerce requirement

of the MCA exemption or the applicability of the small vehicle exception.

Mr. Crum urges the Court to consider the fact that when he loaded a truck, he paid no attention to safe loading practices and simply followed company policy to load as much freight onto each truck as possible as quickly as possible. The Court has not taken the argument lightly. The argument rests on DOL regulation 29 C.F.R. 782.5 which states that a loader for purposes of the MCA must have "responsibility[,] when [] motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized."

The Court recognizes that other courts have considered the DOL regulation in evaluating the MCA exemption and have found a question of fact regarding the exemption where the evidence indicated that an employee did not exercise judgment or skill in loading a truck so as to ensure that the weight of items placed in the truck was distributed safely. *See, e.g.*, *Aguilar v. Grupo Medex, Inc*., 2008 WL 11409044, at *6 (S.D. Fla. Dec. 8, 2008) (finding issue of material fact as to whether plaintiff was a loader where evidence showed that plaintiff "knew how to place the boxes safely and securely in the [truck] so that the boxes did not get damages during transport and to ensure the safe operation of the vehicle," but the plaintiff "never weighed the merchandise that [was] loaded and [] was not in charge of balancing the

boxes in the truck" but merely "filled the truck to capacity based on the size of the boxes") (internal quotations and citation omitted); *Pravia v. Blasa Grp., Inc*., 2008 WL 821611, at *3–4 (S.D. Fla. Mar. 27, 2008) ("Plaintiffs simply wheel[ed] the hand-truck packages onto the trucks, as directed by a supervisor, and 'dumped it down.' They made none of the discretionary decisions about whether to put the load at the front of the truck, or the back of the truck, or the height that was supposed to be stacked (or not stacked) or any of the other decisions that would obviously go into placement of a load from maneuverability on the public highways. Plaintiffs testified that they merely provided physical labor in the lifting and moving of freight . . . . Plaintiffs testified at trial that they simply did what they were asked to do, 'load the trucks' . . . . The testimony at trial fails to demonstrate that the Plaintiffs shared in the exercise of discretion as to the manner in which the loading was done and does not prove that Plaintiffs possess any knowledge or skill which would lend itself to be interpreted as the kind of loading which would affect safety of operation of motor vehicles in interstate commerce.").   Indeed, after the Supreme Court remanded *Ispass*, the district court noted that "from the views of the Interstate Commerce Commission," loaders subject to ICC regulation "have a certain amount of skill and judgment attached to their duties in the proper distribution of weight in order to insure [*sic*] safety of operation." *Ispass v. Pyramid Motor Freight Corp*., 78 F. Supp. 475, 478 (S.D.N.Y. 1948).

The Court respects the analysis in those opinions but declines to follow it because as the Court has held, it understands *Levinson* to call for application of ICC/DOT regulations rather than DOL regulations to determine the jurisdiction of the DOT. *Levinson*, 330 U.S. at 661; (Doc. 39, pp. 10-11). In *Levinson*, the Supreme Court stated that "Congress has prohibited the overlapping of the jurisdiction of the [DOL] with that of the [ICC] as to maximum hours of service" and that "[w]hen examined from the point of view of the Motor Carrier Act alone, much light is thrown on the meaning of [§] 204 [of the Interstate Commerce Act] by the interpretation made of it by the [ICC]." *Levinson*, 330 U.S. at 661-62. The Supreme Court instructed that regulations that the ICC promulgated before and after Congress adopted the FLSA "deal so thoroughly and expertly with the safety of operation of interstate motor transportation as to entitle them to especially significant weight in the interpretation of this Act, the enforcement of which has been committed by Congress solely to" the ICC. *Levinson*, 330 U.S. at 662. And the Supreme Court stated unequivocally:

> it is important to recognize that, by virtue of the unique provisions of [§] 13(b) (1) of the Fair Labor Standards Act, we are not dealing with an exception to that Act which is to be measured by regulations which Congress has authorized to be made by the Administrator of the Wage and Hour Division. United States Department of Labor. Instead, we are dealing here with the interpretation of the scope of the safety program of the Interstate Commerce Commission, under [§] 204 of the Motor Carrier Act, which in turn is to be interpreted in the light of the regulations made by the Interstate Commerce Commission pursuant to that Act.

*Levinson*, 330 U.S. at 676-77 (footnote omitted).  For this reason, the Court follows others that have "give[n] no weight to the DOL's regulation purporting to define who is an exempt loader."  *Williams v. Central Transport Int'l, Inc.*, 830 F.3d 773, 778 (8th Cir. 2016); (Doc. 39, p. 11).

In making that decision, the Court recognizes that in *Baez v. Wells Fargo Armored Service Corp.*, after finding that driver-helpers were exempt from overtime compensation under the FLSA because the defendant was a contract carrier permitted by the ICC, making the carrier subject to the jurisdiction of the DOT, the Eleventh Circuit observed in a footnote that the DOL had adopted a regulation concerning driver's helpers and stated that the Court of Appeals owed deference to that regulation.  938 F.2d at 182 n.4 (citing 29 C.F.R. § 782.4).  For the proposition that it owed deference to the DOL regulation, the Court of Appeals cited a page in *Levinson* in which the Supreme Court discussed the deference that it gave to ICC conclusions of law with respect to ICC jurisdiction.  *Baez*, 938 F.2d at 182 n.4 (citing *Levinson*, 330 U.S. at 671-72).

The Court respects the Eleventh Circuit's analysis in *Baez* and reaches the same conclusion with respect to application of the MCA exemption, but the Court does not feel constrained by *Baez* to give deference to 29 C.F.R. § 782.5 because the statement in *Baez* regarding deference to a DOL regulation is dicta, and the Eleventh Circuit is not bound by that dicta.  *U.S. v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir.

1980) ("We recognize that Wilkinson, supra, opines in dicta that the decision is interlocutorily appealable.  [*United States v. Wilkinson*,] 601 F.2d at 795. That panel did not confront the issue as we do, however, and was not called on to struggle with it as we have. We are not bound by dicta, even of our own court. *Bruce v. Estelle*, 536 F.2d 1051, 1059 n.5 (5th Cir. 1976), cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). And though we accord it the greatest deference and persuasive force, mature consideration has convinced us that we should not follow it here. Dicta of the Supreme Court are, of course, another matter.").  In the face of dicta from the Eleventh Circuit and an explicit instruction from the Supreme Court, the Court believes it is bound to follow *Levinson* and apply the definition of loader from the ICC regulations rather than the DOL regulation.

As the Supreme Court explained in *Levinson*, the test under ICC regulations is whether an employee's activities "affect the safety of operation" of a motor vehicle, not whether the employee subjectively thought about or implemented safe practices as he loaded a truck.  *Levinson*, 330 U.S. at 660.  The work Mr. Crum performed when he loaded trucks and supervised subordinate employees as they loaded trucks affected the safe operation of those trucks, even if Mr. Crum paid little or no attention to safe loading practices.  (*See* Doc. 42-1, p. 26, tp. 104).  Therefore, Mr. Crum's work for FAS fell within the jurisdiction of the DOT, not the DOL, and the MCA exemption precludes Mr. Crum's claim for overtime wages under the

20

FLSA.

To be sure, the result in this case is not satisfying.  Mr. Crum and others like him fall into a void created by DOT's failure to exercise its jurisdiction to establish the maximum number of hours that loaders may work during a 24-hour period. Recall that the Supreme Court observed in *Levinson* that, though the ICC had jurisdiction to establish "qualifications and maximum hours of service with respect to loaders," the ICC had not done so.  *Levinson*, 330 U.S. at 673.  The Court has not found a regulation, issued since the Supreme Court decided *Levinson*, that fills the gap.  If Mr. Crum's allegations are true, and the Court assumes for purposes of this opinion that they are, then this regulatory omission permits untrained employees to load trucks for, in this case, 12 hours per day, a situation that could have "serious consequences" for safe operation of those trucks on local roads and highways. *Levinson*, 330 U.S. at 679.  As problematic as the Court finds that state of affairs, the Court must hope that, if a gap exists, DOT will fill it quickly for the sake of safe roadways and fair compensation for the employees whose work contributes to safe roadways.

## V.

For the reasons discussed, the Court grants FAS's renewed motion for summary judgment.  By separate order, the Court will enter judgment for FAS on Mr. Crum's FLSA claim.

**DONE** and **ORDERED** this February 6, 2023.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE